UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | CV-06-29-B-W |
| v. | ) | |
| | ) | |
| ONE HUNDRED SIXTY-FIVE | ) | |
| THOUSAND FIVE HUNDRED | ) | |
| EIGHTY DOLLARS ($165,580) | ) | |
| IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendant-in-rem. | ) | |

## ORDER ON GOVERNMENT'S MOTION TO DISMISS
## VERIFIED STATEMENTS OF INTEREST

On February 4, 2005, two railroad employees happened upon a black duffel bag in the

bushes at the side of the tracks, opened it, and discovered $165,580.00 in cash.  Having turned

the money over to the United States Government, they would like it back, citing common law

and the Maine statutory modification of the ancient rule "finders, keepers."  The United States

has a different idea.  It contends that under federal statute, the money must be forfeited to the

United States Government, because the cash is traceable to the proceeds of drug trafficking and

is evidence of the violation of federal currency laws.

**I.     Factual Background[1]**

---

[1] This began as a motion to dismiss, but on February 16, 2007, at an oral argument, the parties agreed that the Court could consider as true the allegations in the Complaint and the statements in the Claimants' letters of claim; the Government also introduced the Claimants' answers to interrogatories.  As such, the motion has become a motion for judgment on a stipulated record as against the claims of Mr. Madore and Mr. LaPointe.  *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 11-12 (1st Cir. 1985); *see also Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 31 (1st Cir. 2000).  To avoid perplexing the case filing system, however, the Court is acting on the motion as a motion under its filing title – motion to dismiss.

In the deep of the Maine winter, the St. John River, which forms the border with Canada, freezes over as it flows through the town of Van Buren. Instead of a moat, the river is seasonally transformed into a pathway, suitable for travel by foot or snowmobile; for those who prefer to avoid United States Customs, particularly those engaged in illegal drug importation, the River becomes an opportunity for illegal entry into the United States. Typically, the smuggling consists of drugs being brought into the United States and cash heading for Canada.

The United States Border Patrol (USBP), however, keeps a watchful eye on the frozen river and checks for comings and goings. On February 2, 2005, Patrol Officer Mark D. Albert of the USBP observed fresh snowmobile tracks near a residence that borders the St. John and that has been associated with the smuggling of contraband. He followed the snowmobile tracks as they led across Route One, down some railroad tracks, and to a local business. Following the tracks north, he observed that they went out onto the frozen river and entered Canada, an entry which would have been illegal. He also observed two pairs of footprints near the residence and an indentation in the snow that suggested that a large bag had been placed in the snow and then picked up. Based on USBP intelligence, the Agent had reason to suspect that the markings in the snow were consistent with a drug smuggling operation.

Two days later, on February 4, 2005 at about 4:20 p.m., Senior Patrol Agents Robert W. Crawford and Stephen A. Brooker were patrolling the same area, when they saw a snowmobile driving up the same railroad tracks, where Agent Albert had made his observations. A Maine, Montreal, and Atlantic (MMA) train was slowly following the snowmobile. The tracks of the snowmobile later revealed that its driver had crossed the river and entered Canada illegally. About 4:45 p.m., two MMA employees – Daniel Madore and Traves LaPointe – came up to the Senior Patrol Agents and reported that they had recovered a black duffel bag in some bushes on

the north side of the tracks and when they opened the bag, they found it contained a large amount of U.S. currency.  Two agents took custody of the bag and the money.

About five minutes later, a snowmobile came along the railroad tracks and the Agents approached the driver.  Agent Crawford had the black duffel bag strapped to his back in plain view.  The driver identified himself as Allen Gagnon, a forty-three year old dual United States – Canadian citizen, living in Van Buren.  The Agents and Mr. Gagnon conversed, and despite the obviousness of the black duffel bag, Mr. Gagnon made no mention of it.  The Agents returned to the Border Patrol station and securely locked the bag and its contents in a safe.  The next day, a drug-sniffing dog gave a positive alert on the bag for the scent of drugs.

Allen Gagnon decided to lay claim to the money.  On February 7, 2005, he first called and then came to the USBP, saying that the bag contained his life savings.  During his telephone conversation, Mr. Gagnon said that he had packed the money and knew exactly how much was in the duffel bag.  When he came to the USBP station, Mr. Gagnon became agitated, said that he knew the agents had his money, and accused them of playing games.  He stormed out of the Border Patrol station, slammed the door, and, got in the passenger side of a vehicle.  He proclaimed to the driver that the Border Patrol would hear from his attorney and the driver, as he squealed his tires leaving the Boarder Patrol parking lot, gave the Patrol a one finger salute.  Mr. Gagnon telephoned the Border Patrol later that day and again insisted the Patrol return his money.

On March 10, 2005, Mr. Gagnon wrote the USBP, enclosing a Petition for Relief, asserting that he is the sole and rightful owner of both the bag and the cash.  In the Petition, he described exactly how much money was in the duffel bag, how it was wrapped, and how he came to lose it.  On August 31, 2005, he returned to the USBP for an interview and explained

that he possessed the cash because he did not want to leave it in his rented room and was taking it for safe keeping to his sister's.  He contended that during the winter, he always traveled around the Van Buren area with his life savings in a bag strapped to his snowmobile.  The Government reviewed Mr. Gagnon's reported wages from 1999 to 2006 and the math did not begin to add up to an extra $165,000.00.

## II.    Procedural History

On March 1, 2006, the Government filed a civil forfeiture complaint against the $165,580, pursuant to 21 U.S.C. § 881(a)(6), 31 U.S.C. § 5317(c), and 31 U.S.C. § 5332(c).[2]  *See Verified Compl. for Forfeiture* (Docket # 1) (*Compl.*).  Allen Gagnon, who was served with the Complaint (Docket # 7),  never responded and was defaulted on June 14, 2006.  *See Order Granting Motion for Entry of Default* (Docket # 18).

On April 7, 2006 and April 10, 2006, Daniel Madore and Traves LaPointe respectively wrote letters that described the circumstances under which they found the money and stated that they "would like to file a claim for this property."[3]  *Notices of Claim* (Docket # 4, 5).  On June 8, 2006, each filed verified statements of interest, citing as authority 33 M.R.S.A § 1056 and the common law.  *See Verified Statement of Interest by Daniel Madore* (Docket # 8); *Verified Statement of Interest by Traves LaPointe* (Docket # 9).   Mr. Madore and Mr. LaPointe (Claimants) filed answers to the Complaint on June 30, 2006 (Docket # 20, 21), denying the essential allegations of the Complaint.  During discovery, they attached to their answers to

[2] 21 U.S.C. § 881(a)(6) provides a forfeiture for "all moneys . . . furnished . . . by any person in exchange for a controlled substance . . . ."; the Government alleges a violation of § 881(a)(6) in Count I. *Compl.* ¶¶ 17-19.   31 U.S.C. § 5317(c)(2) provides a civil forfeiture of  "[a]ny property involved in a violation of section 5313, 5316, or 5324 of [title 31]." Section 5316 sets forth currency reporting requirements for transporting more than $10,000.00 out of the United States; the Government alleges violation of § 5316 in Count II of the Complaint. *Id.* ¶¶ 20-22. 31 U.S.C. § 5332(c)(2) imposes a civil forfeiture for the knowing concealment of cash in excess of $10,000.00 in currency with the intent to evade a currency reporting requirement; the United States alleges a violation of § 5332(c)(2) in Count III of the Complaint. *Id.* ¶¶ 23-25.
[3] The Madore letter begins "Dear Sir(s)" and the LaPointe letter is addressed "To Whom It May Concern;" neither contains the name or address of the addressee.

4

interrogatories copies of a letter dated August 18, 2006 from Attorney Erickson to Attorney Frank Bemis of Presque Isle, advising him that the town of Van Buren "may wish to file a claim in the United States District Court to reserve your interest." *Party in Interest Dan Madore and Party in Interest Traves LaPointe's Answers to Interrogatories*, Ex. A (*Gov't Ex.* 1, 2).

The Government moved to dismiss the verified statements for lack of subject matter jurisdiction; specifically, the Government asserts that the Claimants lack standing. *See Motion to Dismiss Verified Statements of Interest* (Docket # 25) (*Govt.'s Mot.*).

## III.   Discussion

### A.   Constitutional Standing

"Standing is a threshold consideration in all cases, including civil forfeiture cases." *United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 40 (1st Cir. 2003) (hereinafter *Bulger*);[4] *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975).   As an in rem proceeding, a civil forfeiture action is unlike most other civil actions, because the defendant is the property subject to forfeiture. *Bulger*, 326 F.3d at 40; *United States v. Land & Buildings*, No. 05-cv-302-SM, 2006 U.S. Dist. LEXIS 21137, at *8 (D.N.H. March 29, 2006).   It is the claimant, not the plaintiff, who must demonstrate standing. *Bulger*, 326 F.3d at 40.

To contest the forfeiture, claimants must "first demonstrate an ownership or possessory interest in the seized property." *Id.* at 41.   Nevertheless, the First Circuit has cautioned that courts should not "conflate the constitutional standing inquiry with the merits determination that comes later" and has noted that the requirements to demonstrate constitutional standing are "very forgiving." *Id.*   The claimants need only show they have a "colorable" ownership interest in the

---

[4] Although helpful, *Bulger* was based on the law before the enactment of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202.

property.  *Id.*; *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003).  Courts have held that "an allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture."  *United States v. United States Currency, $81,000.00*, 189 F.3d 28, 35 (1st Cir. 1999); *see also United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1113 (5th Cir. 1992).  To evaluate a claim to property, the Court engages in a two-step process.  State law "determines his ownership interest . . . , but federal law determines the effect of his ownership interest on his right to bring a claim."  *United States Currency, $81,000.00*, 189 F.3d at 33; *One Lincoln Navigator 1998,* 328 F.3d at 1013.

### 1.  The Claimants' Property Interest Under Maine Law

Maine law provides a statutory procedure for a person who finds lost property – money or goods – to claim an interest in the property.  33 M.R.S.A. § 1051 specifies:

> Whoever finds lost money or goods of the value of $3 or more shall, if the owner is unknown, within 7 days give notice thereof in writing to the clerk of the town where the money or goods are found and post a notification thereof in some public place in said town. If the value is $10 or more, the finder, in addition to the notice to the town clerk and the notification to be posted, shall, within one month after finding, publish a notice thereof in some newspaper published in the town, if any, otherwise in some newspaper published in the county.

33 M.R.S.A. § 1051.  In their verified statements of interest, the Claimants cite 33 M.R.S.A. § 1056 as authority for their claim to the currency.  That statute provides:

> If no owner appears within 6 months, such money or lost goods shall belong to the finder by paying 1/2 their value after deducting all necessary charges to the treasurer of said town; but if he neglects to pay it on demand, it may be recovered in an action brought by said treasurer in the name of the town.

*Id.*  The Claimants assert that this statute entitles them to "one half the property plus expenses, and provides that the town receive the remainder."  *Claimants' Obj. to Govt.'s Mot. to Dismiss*

*Verified Statements of Interest* at 2 (Docket # 26) (*Claimants' Obj.*).  The statute goes on to provide:

> If the finder of lost money . . . neglects to give notice to the town clerk and to cause them to be advertised as provided, he forfeits to the owner the full value thereof unless he delivers or accounts therefor to the owner, in which case he shall forfeit not more than $20, ½ to the town and ½ to the prosecutor.

33 M.R.S.A. § 1058.

There is a factual dispute as to whether the Claimants complied with the Maine statute. The Government contends that the Claimants did not, because they failed to "provide notice to the clerk of Van Buren, post notice or advertise their find within the time periods required by 33 M.R.S.A § 1051." *Govt.'s Reply to Claimants' Response to the Govt.'s Mot. to Dismiss* at 2 (Docket # 27) (*Govt.'s Reply*).  The Claimants maintain that they "have notified the town of Van Buren, Maine of their discovery of the money pursuant to 33 M.R.S.A. § 1051" and that "[o]n June 8, 2006, [they] filed verified statements of interest laying claim to the defendant-in-rem as finders, within the meaning of 33 M.R.S.A. § 1051 *et seq.*" *Claimants' Obj.* at 2.

The evidence does not support the Claimants' contention.  Maine law requires that "[w]hoever finds lost money of the value of $3 or more shall, if the owner is unknown, *within 7 days* give notice thereof in writing to the clerk of the town where the money . . . [is] found and post a notification thereof in some public place in said town."  33 M.R.S.A. § 1051 (emphasis supplied).  Further, if the value of the property is more than $10 the "finder, in addition to the notice to the town clerk and the notification to be posted, shall, *within one month* after find, publish a notice thereof in some newspaper published in the town, if any, otherwise in some newspaper published in the county."  *Id.* (emphasis supplied).  First, the Claimants failed to comply with both the seven-day and the one-month requirements.  They found the money on

February 4, 2005, and there is no evidence they filed a notice with the town clerk of Van Buren by February 12, 2005, or that they published a notice within a month with a local newspaper.[5] Second, none of the Claimants' documents confirms that notice was sent to the Van Buren town clerk as required by the statute. Third, none of the Claimants' documents confirms that they posted the notice in Van Buren. Finally, none of the Claimants' documents establishes that they published a notice in the local newspaper. To the extent the statute requires compliance with its provisions to assert a claim for found property, the Claimants have failed to establish compliance.

The consequences of their failure are unclear. If notice is given and the true owner appears, the finder has no right to the property; instead, the owner "shall have . . . the value of the money or goods, paying all necessary charges and reasonable compensation to the finder for keeping . . . . " 33 M.R.S.A. § 1054. If no notice is given and the true owner appears, the finder "forfeits to the owner the full value thereof, unless he delivers and accounts thereof to the owner . . . ."[6] 33 M.R.S.A. § 1058. The overriding point is that the statute provides a mechanism for notifying the true owner of lost property and once that owner appears and lays claim to the property, the finder – notice or not – does not have an ownership interest superior to the true owner. This point is clarified in the language of § 1051. It becomes applicable only when the owner is "unknown." 33 M.R.S.A. §§ 1051, 1052.

Here, there are two possible "true" owners: Allen Gagnon and the United States. It is a logical inference from the Complaint that the owner of the $165,580.00 is Allen Gagnon. It

---

[5] There are three documents that could purport to comply with these notice requirements: (1) the letters dated April 7, 2006 and April 10, 2006; (2) the Verified Statements of Claim dated June 8, 2006; and, (3) the letter to Attorney Bemis dated August 18, 2006. None complies with the statutory periods.

[6] The statute goes on to provide that if he "delivers and accounts therefor to the owner," he "shall forfeit not more than $20, ½ to the town and ½ to the prosecutor." 33 M.R.S.A. § 1058. This section is entitled, "failure to give notice; penalty," and it appears to require the finder not only to return the money, but it imposes an additional penalty upon the finder who fails or refuses to comply with the notice provisions of the law.

would be passing strange for someone with no connection to the money in the duffel bag not only to know the exact amount of money in the bag, but also how it was wrapped and where it was lost.  Mr. Gagnon's decision not to file a claim in the unusual circumstances of this case does not mean that he is not the owner; it only means that – likely for good and sufficient reason – he has decided not to claim the cash.

Even so, Maine law does not give the Claimants a right to the money.  Federal statutory law grants the United States Government an ownership interest in the cash, since it is money "furnished or intended to be furnished by any person in exchange for a controlled substance" or "proceeds traceable to such an exchange . . . ."  21 U.S.C. § 881(a)(6).  The law provides that such illicit cash is forfeited to the Government and the Complaint clarifies that the money in this case is the other side of an illegal drug deal and as such, is illicit.  If, for example, a cache of cocaine were found before the exchange for $165,580, it would take a person of unusual chutzpa and foolishness to claim entitlement to the cocaine under Maine statutory law.  The Claimants can no more claim ownership in the proceeds of an illegal drug deal than they could claim rightful ownership in illegal drugs themselves or in the proceeds of an illegal gambling operation or house of prostitution.  Simply because they found the money on the side of the railroad tracks does not legitimize the cash or their claim to it.  Here, the Government seized the money because of its suspected involvement in the drug trade and, as such, it is statutorily subject to forfeiture.[7]

---

[7] At oral argument, the Claimants agreed that they have no evidence to refute the Government's contention that the cash was illicit.  If they had a factual basis for contesting the gravamen of the Government's Complaint, this would be a different case.  Under the standard analysis, therefore, the Government established probable cause that the property was used to facilitate a violation of federal criminal law.  Once this burden is met, the burden shifts to the claimant to establish a defense to the forfeiture.  *United States v. One 1974 Porsche 911-S Vehicle Identification No. 9114102550*, 682 F.2d 283, 285 (1st Cir. 1982).  To establish probable cause, the Government must "only show a reasonable ground for belief of the property's guilt, supported by less than prima facie proof but more than mere suspicion."  *United States v. One Parcel of Real Property*, 921 F.2d 370, 373 n.6 (1st Cir. 1990) (citing *United States v. $250,000 in United States Currency*, 808 F.2d 895, 897 (1st Cir. 1987)) (internal punctuation omitted).

In short, the Claimants have not demonstrated compliance with the notice provisions of 33 M.R.S.A. §§ 1051 *et seq.* and, even if they had, Maine law would not grant them an interest in the cash superior to the true owner, whether Mr. Gagnon or the United States Government.

### 2. The Unexplained Naked Possession of Cash

To establish standing to bring their forfeiture challenge, the Claimants must show more than "unexplained naked possession of cash." *United States v. $1,189,466.00 in U.S. Currency*, No. Civ. A. 1:06-CV-330GE, 2006 WL 2228939, at *2 (N.D. Ga. Aug. 2, 2006). Because the Claimants have failed to do so, this Court concludes they lack constitutional standing to assert their statements of interest.

Two cases put this conclusion into perspective. In *United States v. $1,189,466.00 in U.S. Currency*, No. 1:06-CV-330GE, 2006 WL 2228939 (N.D. Ga. Aug. 2, 2006), a cab driver carrying one passenger was stopped by police for a traffic infraction. *Id.* at *1. After a consented-to search of the trunk, police found a suitcase that had been placed there by the passenger of the taxi. *Id.* When drug-sniffing dogs detected narcotics, the police opened the suitcase and found bundles of money wrapped in cellophane. *Id.* The cab driver filed a claim, asserting ownership of the property because it was found in his taxi and there were no other claimants. *Id.* at *2. The court found that the claimant lacked standing because the property was never lost, he was never in possession of the property, and had no fiduciary duty to the true owner. *Id.*

In *One Lincoln Navigator 1998*, the government pursued forfeiture of an automobile upon belief that it was used by an individual suspected of distributing crack cocaine. 328 F.3d at 1012. The suspect's mother and grandmother each filed claims of ownership pursuant to 18 U.S.C. § 983. *Id.* Title to the vehicle was in the mother's name, and the vehicle was actually

purchased by the grandmother. *Id*. Applying Arkansas law, the court concluded that both claimants had constitutional standing: the law states that the holder of title of a vehicle is the owner, and the purchaser of the vehicle had the greatest financial stake. *Id*. at 1013. The court pointed out, in contrast, that "mere possession of the Navigator . . . does not establish an ownership interest." *Id*. at 1014-15.

The case here is more like *$1,189,466.00 in U.S. Currency*, and less like *One Lincoln Navigator 1998*. In *One Lincoln Navigator 1998*, the two claimants had clear ownership interests in the property seized – one actually purchased the vehicle and the other held legal title. Like the cab driver in *$1,189,466.00 in U.S. Currency*, here the Claimants merely came upon the money as the result of a fortuitous incident. While they might have briefly possessed the currency, mere naked possession does not rise to the level of an ownership interest. A comparison to these two cases supports that the Claimants lack constitutional standing.

**B.    Statutory Standing**

Article III standing aside, the Claimants must also demonstrate that they have statutory standing to contest the forfeiture action.[8] *Bulger*, 326 F.3d at 40. Under federal law, monies that are the result of an unlawful undertaking are subject to forfeiture. *See* 21 U.S.C. § 881; 31 U.S.C. § 5317; 31 U.S.C. § 5332. However, federal law provides for an innocent owner defense, stating: "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d). The statute logically defines "owner" as someone with an ownership interest, including "a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest . . . ." 18 U.S.C. § 983(d)(6)(A).

---

[8] Although this question is sometimes included in the statutory analysis, it is actually "an element of the innocent owner's claim on the merits." *One Lincoln Navigator 1998*, 328 F.3d at 1014.

As it applies to the facts in this case, the federal statute anticipates this exact scenario, where innocent finders come upon property that has been used in an illegal drug deal. The statute does not make their interests superior to the federal Government; instead, it expressly provides that an "owner" is not someone "with only a general unsecured interest, or claim against, the property or estate of another." 18 U.S.C. § 983(d)(6)(B).

Even if the Claimants could establish Article III standing, they have not demonstrated that they are innocent owners under 18 U.S.C. § 983(d)(6). First, their claim does not fall into any of the types of ownership interests enumerated in the statute. But, even if – as the Claimants assert – the list of cognizable ownership interests under § 983(d)(6)(A) is non-exhaustive, they still have shown no cognizable interest other than mere possession. The Maine statute does not create an ownership interest in the property; rather, it provides a statutory procedure to lay claim for property by giving notice of that claim against other possible owners. At best, even if successful under the Maine statute, the Claimants would have only a general unsecured interest or a claim against the money that they found alongside the railroad tracks and the federal statute is explicit that a "general unsecured interest" does not constitute ownership.

The Claimants' reliance on common law to satisfy the § 983 definition of "owner" fares no better. It is true that under common law lost property "belongs to the first finder as against all persons but the loser." *Lawrence v. Buck*, 62 Me. 275, 276 (1874). However, as the Maine Supreme Judicial Court explained in *Weeks v. Hackett*, 104 Me. 264, 268, 71 A. 858, 859-60 (1908), the "general rule is established by a substantially uniform line of decisions in the American States, with respect to both lost goods, properly so termed, and treasure-trove, that *in the absence of legislation upon the subject*, the title to such property belongs to the finder as against all the world except the true owner . . . ." *Id*. (emphasis supplied).

Here, there is "legislation upon the subject." *Weeks* observes that the "rule of the common law respecting the rights and duties of the finder of lost money or goods has been variously modified by the terms and provisions of local statutes of many States" and notes that "the provisions of the Maine Statutes (R.S., ch. 100, sect. 10, *et seq.*) have no reference to the law of treasure-trove." *Id.*, 71 A. at 860.  *Weeks* distinguishes between treasure-trove, property found concealed in the earth or in a house or other private place, and property found lying on the ground.  *Id.* at 267; 71 A. at 859.  *Weeks* implies that the common law has been statutorily modified in Maine as regards property found on the earth by the predecessor the 33 M.R.S.A. §§ 1051 *et seq.*, but not as regards treasure-trove.

But more significantly, the specific federal forfeiture statute pre-empts general principles of common law concerning the legal rights of those who find property.  *See United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1311 n.14 (11th Cir. 1999).  The Claimants lack statutory standing because they are not owners entitled to the innocent owner defense.

## III.    Conclusion

Because the Claimants have failed to meet their burden to demonstrate both constitutional and statutory standing, the Court  GRANTS the Government's motion to dismiss the verified statements of interest filed by Daniel Madore and Traves LaPointe (Docket # 25).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of February, 2007